17-3337-cr
United States v. Balde

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2018

Argued: November 6, 2018     Decided: June 13, 2019

Docket No. 17-3337-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

SOULEYMANE BALDE,

*Defendant-Appellant.*

B e f o r e :

HALL and LYNCH, *Circuit Judges,* and GARDEPHE, *District Judge.*[*]

Souleymane Balde, a citizen of Guinea, appeals his conviction for one count of unlawful possession of a firearm by an "alien . . . [who] is illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5)(A). He

---

[*] Judge Paul G. Gardephe, of the United States District Court for the Southern District of New York, sitting by designation.

challenges his conviction on two grounds. First, he argues that at the time he possessed the firearm he was not "in" the United States because he had not "entered" the United States as that term is defined for the purposes of immigration law, and second, he argues that even if he was "in" the United States, he was not present "illegally or unlawfully." Finding both arguments unavailing, we AFFIRM the judgment of the district court.

————————

MATTHEW B. LARSEN, Federal Defenders of New York, New York, NY, *for* Defendant-Appellant Souleymane Balde.

ELINOR TARLOW, Assistant United States Attorney (Anna M. Skotko, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

————————

GERARD E. LYNCH, *Circuit Judge*:

Souleymane Balde pled guilty to one count of unlawful possession of a firearm by an "alien . . . [who] is illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5)(A). On appeal, Balde argues that the charge against him must be dismissed for two reasons. First, he argues that to be "in the United States" within the meaning of the criminal statute, a noncitizen must have "entered" the United States as that term is defined in immigration law, and that merely being physically present within our borders does not suffice. Second, he

argues that, even if he was "in" the United States when he possessed a firearm, he was not then here "illegally or unlawfully," given the particular circumstances of his release from immigration detention and his immigration status.

Because we find both arguments unavailing, we AFFIRM the judgment of the district court.

## BACKGROUND

Souleymane Balde is a citizen of Guinea. He first arrived in the United States as a child, without lawful immigration status. In May 2005, Balde sought to adjust his status to become a lawful permanent resident, apparently pursuant to the terms of a class action settlement agreement.[1] To qualify for adjustment of status, Balde had to be interviewed by the United States Citizenship and Immigration Services ("USCIS"). His interview was originally scheduled for December 1, 2005.

Several months after applying, however, Balde learned that his mother was

---

[1] Balde claimed that he applied under the LULAC (Newman) settlement agreement. That agreement "allow[ed] for those who meet certain requirements to apply or reapply for Temporary Resident status under the 1986 amnesty program of [8 U.S.C. § 1255]." News Release, USCIS, 2005 WL 1157041 (May 16, 2005) (extending deadline to apply for legalization under the LULAC (Newman) settlement agreement until December 31, 2005); *see also* 8 C.F.R. § 245a.14 (describing procedures for applying for legalization under LULAC and two other class action settlement agreements).

3

seriously ill and that unless he traveled to Guinea to visit her soon, he risked missing his last chance to see her alive. He asked his attorney to postpone the interview in order for him to travel abroad. His lawyer told Balde that he would contact USCIS to postpone the interview. The lawyer wrote to USCIS, stating that Balde would be unable to attend his interview due to unforeseen circumstances. Balde also applied for advance parole, a status which allows a noncitizen to travel abroad temporarily and return to the United States without jeopardizing any existing legal status or pending application for immigration relief. USCIS granted advance parole, but did not act on the request to postpone the interview.

Balde did not appear for his scheduled interview, although he did not leave the United States until several weeks after the scheduled interview date and USCIS had not granted an adjournment. On January 27, 2006, while Balde was out of the country, USCIS denied his application for adjustment of status because he had missed his interview and because it determined that the request for postponement submitted by Balde's attorney did not demonstrate sufficient reason to postpone it. The agency also revoked Balde's advance parole.

Balde's mother died on January 28, 2006. On March 17, 2006, Balde flew back to New York City and was stopped at John F. Kennedy Airport, where

4

Customs and Border Protection ("CBP") agents informed him for the first time that his advance parole had been revoked. CBP agents detained Balde and initiated removal proceedings, charging him as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I), which applies to noncitizens seeking admission without a valid visa, passport, or other suitable travel document. In due course, an immigration judge issued an order of removal. Balde appealed, first to the Board of Immigration Appeals ("BIA"), which dismissed the appeal, and then to this Court, which granted a stay of removal pending decision.

While his appeal was pending before this Court and his removal was stayed, Balde sought supervised release from detention. The United States Immigration and Customs Enforcement Agency ("ICE") agreed to grant such release, and notified Balde that he would be released under the Intensive Supervision Appearance Program ("ISAP"). First implemented in 2003, ISAP offers "an alternative[] to detention for final-order aliens" who are unable to be removed, and provides for electronic monitoring and supervision for program participants. *See Nguyen v. B.I. Inc.*, 435 F.Supp.2d 1109, 1112–13 (D. Or. 2006).

Following a remand from this Court on consent of the parties, the BIA again denied relief to Balde on December 19, 2008. Balde did not appeal to this

5

Court, and the order of removal became final. Balde's passport expired around that time, however, and the government was therefore unable to effect his deportation. He remained at liberty, under supervision. Immigration officials modified the terms of that supervision in 2012. At no time, however, did Balde hold a visa or other legal authorization to enter the United States, and he remained subject to a final order of removal.

On December 14, 2015 — seven years after his removal order became final — Balde was involved in a fight in a Bronx delicatessen. During the altercation, Balde pulled out a gun and pointed it at others inside the deli. He then left the premises, but returned a short while later and fired a single shot into the air from the passenger seat of a vehicle outside the deli.

When officers from the New York City Police Department responded to the scene, witnesses identified the car from which the shot had been fired as it pulled up to an intersection nearby. Police officers pursued and stopped the vehicle. Balde got out of the car from the front passenger seat, and was quickly apprehended. A police search discovered four cartridges in Balde's jacket pocket, and a revolver under the front passenger seat where Balde had been sitting.

Witnesses at the deli later identified Balde as the person who had fired the gunshot.

A grand jury indicted Balde on one count of possession of a firearm in violation of 18 U.S.C. § 922(g)(5). He moved to dismiss the indictment. After the district court denied the motion he pled guilty pursuant to an agreement that preserved his right to appeal the district court's denial of his motion. The district court sentenced Balde to 23 months' imprisonment and two years of supervised release. He now appeals that conviction.

## DISCUSSION

18 U.S.C. § 922(g)(5)(A) prohibits an "alien . . . illegally or unlawfully in the United States" from possessing a firearm or ammunition. Balde argues that under his particular immigration circumstances he was not "in" the United States when he possessed the firearm and that, even if he was, he was not here "illegally or unlawfully."

We review the denial of a motion to dismiss an indictment *de novo*. *United States v. Kirsch*, 903 F.3d 213, 221 (2d Cir. 2018). If we were persuaded by either of Balde's arguments, we would be required to vacate the district court's judgment and remand with instructions to dismiss the indictment. However, given the

7

particulars of Balde's situation, we find that he is within the category of individuals prohibited from possessing a firearm under 18 U.S.C. § 922(g)(5)(A), and we therefore affirm the judgment of the district court.

## I.    "In the United States"

Balde first argues that the prohibition of firearms possession in § 922(g)(5)(A) is not triggered by mere physical presence within the territory of the United States, but instead requires that a "defendant must have 'entered' the country as a matter of immigration law." Appellant's Br. at 17. For the technical purposes of immigration law, Balde notes, he did not "enter" the United States when he returned in March 2006, and he should therefore be treated as if he were still at the border seeking admission. Because he has never entered, Balde argues, he is not "in" the United States within the meaning of 18 U.S.C. § 922(g)(5).

As with most matters of statutory interpretation, we start with the text of the statute. "Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) (internal quotation marks and alterations omitted). "In conducting such an analysis, we review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the

placement and purpose of those words in the statutory scheme." *Id.* (internal quotation marks omitted).

The plain meaning here is clear. "In" is an ordinary, familiar English word, with a well understood meaning. Its principal definition in the Oxford English Dictionary is "[w]ithin the limits or bounds of, within (any place or thing)." *In,* OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Taniguchi v. Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 566–66 (2012) (relying on dictionary definitions to aid in interpreting statutory text). Someone arriving to meet a friend might call to say that she was "in the lobby;" she might tell her friend over dinner that she was "in Texas last weekend." It would be clear to the friend in both cases that the speaker meant that she was physically present in those locations at the time she indicated she was "in" them. The plain meaning of the statute reflects that ordinary meaning: a person, citizen or noncitizen, is "in" the United States when he is present within its geographic borders. The text is therefore "absent ambiguity" and our analysis presumptively ends there. *Dobrova*, 607 F.3d at 301.

Accepting Balde's argument would invert the normal plain meaning rule of statutory interpretation by substituting a technical term-of-art meaning for the ordinary plain meaning of a straightforward English word. "In" is not a technical

9

term with a special meaning in immigration law. In order to adopt Balde's interpretation, we would have to replace the plain meaning of "is . . . *in* the United States" with the different meaning of "has *entered* the United States," thus substituting a word that is "a specific legal term" within immigration law. *See United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir. 2006).

We decline to do so for four reasons. First, that is simply not the language that Congress chose. The statute deliberately uses the ordinary word "in," not the more technical term "entered."

Second, substituting "has entered" for "is in" would change the meaning of the statute, even with respect to one who unquestionably had "entered" the United States in the technical immigration sense of the word. The language defining the crime refers to a noncitizen who "is illegally or unlawfully in the United States." A noncitizen who enters the United States with a visa and overstays the term of that visa is clearly *in* the United States illegally but, at least if his decision to stay was made after his arrival, it would not be correct to say that he *entered* the United States illegally.

Third, we are interpreting a section of the criminal code that prohibits gun possession by various categories of person, not an immigration provision.

Criminal laws are ordinarily written to be understood by the non-specialist individuals who are subject to the law, law enforcement officers, prosecutors, and jurors, not to be given arcane hidden meanings identifiable only by immigration lawyers — and even by them only by identifying a "ghost" technical term supposedly lurking behind the actual, non-technical words used in the statute. *See, e.g.*, *Mitsui & Co. v. Am. Exp. Lines, Inc.*, 636 F.2d 807, 814 (2d Cir. 1981) ("Legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.") (citations omitted); *see also Taniguichi*, 566 U.S. at 568 ("That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense").

Fourth, Congress clearly knows how to import the technicalities of immigration law into the federal criminal code when it so chooses. For example, in the subsection immediately following the one at issue here, Congress prohibited possession of firearms by noncitizens who were "admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act)." 18 U.S.C. § 922(g)(5)(B). The

11

fact that Congress did not choose similar technical language in 18 U.S.C. § 922(g)(5)(A) counsels against interpreting "in" in any manner other than by giving it its plain meaning.

Balde bases his argument almost entirely on *United States v. Lopez-Perera*, a decision in which the Ninth Circuit held that § 922(g)(5)(A) inapplicable to a defendant who had not "entered" the United States within the meaning of immigration law. 438 F.3d 932 (9th Cir. 2008). But the facts of that decision are easily distinguishable from those before us. In *Lopez-Perera*, the defendant drove his van from Mexico into the San Ysidro Port of Entry in California, claiming to be a United States citizen. *Id.* at 932–33. At the first checkpoint, an officer directed Lopez-Perera to a secondary inspection area, where he "waited approximately twenty-five minutes . . . and then drove his van toward the north exit of the San Ysidro Port of Entry." *Id*. at 933. Law enforcement officers stopped him before he could leave the area and discovered a revolver in the van. *Id.* Thus, unlike Balde, Lopez-Perera had never left the border area (he was stopped between inspection sites within the Port of Entry) and he had been across the geographic border for mere minutes, not (as Balde had) for years.

*Lopez-Perera*'s legal reasoning, moreover, is not persuasive. In holding that

§ 922(g)(5)(A) requires an "entry," the Ninth Circuit deferred to a regulation

promulgated by the then-Bureau of Alcohol, Tobacco and Firearms ("ATF"). *See*

*id.* at 934–35. That regulation purports to define "[a]lien[s] illegally or unlawfully

in the United States" as noncitizens who "are not in valid immigrant,

nonimmigrant or parole status," including (among other categories) any

noncitizen "[w]ho unlawfully *entered* the United States without inspection and

authorization by an immigration officer and who has not been paroled into the

United States under [8 U.S.C. § 1182(d)(5)(A)]." 27 C.F.R. § 478.11 (emphasis

added). The Ninth Circuit concluded that Lopez-Perera was not within this

definition because he "was never free from official restraint and, therefore, never

entered the United States." *Lopez-Perera*, 438 F.3d at 935.

But even if the ATF regulation were entitled to deference, it does not help

Balde. First, the regulation does not purport to define being "in the United

States" as requiring an entry. Rather, it defines the entire phrase "[a]lien illegally

or unlawfully in the United States," thus conflating the two issues Balde wishes

to separate. Second, it primarily defines the term as referencing noncitizens "not

in valid immigrant, nonimmigrant, or parole status," thus focusing primarily on

what makes their presence unlawful rather than on what constitutes being "in" the country, and it does so in a way that encompasses Balde, who has never had a valid immigrant or non-immigrant visa and is not, as explained in Part II below, in "parole status." And third, the language of the regulation referencing noncitizens who have "entered" the United States is only one *example* of those covered by that definition; another category that is covered is "any alien . . . [u]nder an order of deportation, exclusion, or removal, . . . whether or not he or she has left the United States."27 C.F.R. § 478.11. That category makes no reference to whether or not the individual ever technically effected an "entry" into the United States and by its plain language includes Balde, who was under an order of removal when he was found in possession of a firearm. Thus, however it might have affected Lopez-Perera, when read properly and fully the regulation offers no support to Balde's argument.

In any event, we are not required to defer to the ATF's interpretation. Since *Lopez-Perera* was decided, the Supreme Court has clarified that law enforcement agency interpretations of criminal statutes are not entitled to deference: "Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly . . . , a court has an obligation to correct its error." *Abramski v.*

*United States*, 573 U.S. 169, 191 (2014); *see also United States v. Gayle,* 342 F.3d 89, 93 n.4 (2d Cir. 2003) (noting this Court had requested additional briefing on the issue of deference and both parties agreed that a definition in 27 C.F.R. § 478.11 was not entitled to deference); *United States v. Garcia,* 707 F. App'x 231, 234 (5th Cir. 2017) ("Following the Supreme Court's instruction that no deference is owed to agency interpretations of criminal statutes, specifically the ATF's interpretation of 18 U.S.C. § 922, we decline to show deference to the ATF regulation interpreting § 922(g)(5)(A).").

Given these considerations, we decline to adopt the rule that Balde would like us to derive from *Lopez-Perera.* We conclude instead that the "in the United States" element of 18 U.S.C. § 922(g)(5)(A) requires only that a noncitizen be physically present within the United States. It is uncontested that Balde was physically present here, and so his conviction will stand unless he is able to show he was not present illegally or unlawfully.

## II.    "Illegally or Unlawfully" Present

Balde next argues that, even assuming that he is considered to have been "in" the United States within the meaning of the statute, he was not present "illegally or unlawfully" because he was effectively paroled into the country

when he was released from detention in 2007. His argument essentially rests on what at best amounts to an administrative mistake. Balde did not seek parole as that status is defined in 8 U.S.C. § 1182(d)(5)(A), nor did the government understand itself to be granting him parole at the time it released him from detention. Balde argues, however, that, because he had not been finally ordered removed when he was released from detention, the only statutory authority under which ICE could have released him was the parole authority. Since Balde should not have been found eligible for the program under which he sought and was granted supervised release, he reasons, he must have been, *sub silentio*, granted parole.

It is helpful to contextualize Balde's argument by reviewing the various statutory authorities providing for the detention of noncitizens. The government's authority to detain an individual depends in part on whether that person is seeking admission to the United States or, once having entered, is removable for some reason. *See, e.g.,* 8 U.S.C. § 1226(c) (describing certain categories of noncitizens subject to mandatory detention); 8 U.S.C. § 1225(b)(2)(A) (describing detention during pendency of inadmissibility proceedings). Any status that Balde had when he left the United States had been revoked before he

16

returned. Thus, when he arrived at the airport, he was treated as seeking admission. And an alien seeking admission, like Balde, "shall be detained" pending a removal proceeding "if the examining immigration officer determines that [he] is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A).

The government may also "parole" any noncitizen "applying for admission" into the United States "temporarily under such conditions as [it] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole does not change parolees' immigration status: they remain "at the border" for the purposes of immigration law and are treated as applicants for admission into the country. *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007). But parolees' physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status. *See Cruz-Miguel v. Holder,* 650 F.3d 189, 198 (2d Cir. 2011) ("In other words, the United States accepts an alien paroled under § 1182(d)(5)(A) into the country for as long as the humanitarian or public benefit purpose persists."); *see also United States v. Al Sabahi,* 719 F.3d 305, 309 (4th Cir.

2013) (relying on 27 C.F.R. § 478.11 to note that a defendant is "not illegally or unlawfully in the United States if [he or she is] in valid parole status."); *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 259 (BIA 2010) ("An alien paroled into the United States under section 212(d)(5) of the Act *is authorized to come into the United States* 'temporarily' for urgent humanitarian reasons or significant public benefit and under strict conditions defining his or her status. After the purpose of the parole has been served, the alien returns to custody, and his or her case is dealt with in the same manner as any other applicant for admission." (emphasis added)).

Balde does not dispute that, when he presented himself at the airport on his return from Guinea, he was detained, not paroled, within the meaning of these provisions. His argument focuses, rather, on what happened thereafter, during the lengthy process of adjudicating the government's effort to remove him.

If a noncitizen is administratively determined to be inadmissible, a removal order is entered and further immigration detention is governed by 8 U.S.C. § 1231. The government is required to detain such an individual during the "removal period," the 90-day period (extendable under certain

18

circumstances, *see* 8 U.S.C. § 1231(a)(1)(C)), that begins on either (1) "[t]he date the order of removal becomes administratively final," (2) the date of a final order from a Court of Appeals "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal," or (3) the date of release from criminal detention or confinement. *See id.* § 1231(a)(1)(B), (2). If, at the end of the removal period, the individual still has not been removed, he or she may be released "subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3). But an individual deemed inadmissible by reason of criminal conduct, or one who is deemed a danger to the community or a risk not to comply with the order of removal, "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in" 8 U.S.C. § 1231(a)(3).  *Id.* § 1231(a)(6). Even for individuals detained beyond the removal period, however, continued detention is presumptively limited to six months unless their removal is "reasonably foreseeable." *Clark v. Martinez*, 543 U.S. 371, 378 (2005); *see also Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

At the time ICE granted Balde's application for supervised release, he appears to have fallen outside the categories for which such release was available. He was required to be detained when he presented himself at the

19

border when was not admitted or paroled. And once a stay had been granted by this Court pending appeal, until the final resolution of the appeal Balde had not entered the "removal period," let alone reached the expiration of that period, at which point he would become eligible for release under the conditions set forth in § 1231(a)(3). *See* 8 U.S.C. § 1231(a)(6).

In the documentation accompanying Balde's release from detention, ICE stated that it was reviewing his continued detention pursuant to 8 C.F.R. § 241.4. That regulation states that it addresses the government's "authority to continue an alien in custody or grant release [under 8 U.S.C. § 1231(a)(6)] or parole under [8 U.S.C. § 1182(d)(5)(A)]." *Id.* § 241.4. Balde argues that he could not have been granted release under § 1231(a)(6), even though the documentation suggests that is what ICE contemplated, because his appeal was still pending and thus the removal period had not begun. He therefore argues that, if ICE released him pursuant to 8 C.F.R. § 241.4, the Court should construe that release as parole.

Nothing in the record, however, suggests that Balde applied for, or that the government granted, humanitarian parole. Instead, Balde wrote that he was seeking supervised release, and the government released him under the ISAP program, which provides for the kind of release he requested. If, as Balde

20

contends, he was in fact ineligible for that program because he was not yet subject to a final order of removal, that would mean at most that the government may have been without authority to release Balde from detention when it did. But that does not convert his release into his being paroled into the country within the meaning of 8 U.S.C. § 1182(d)(5)(A), given the absence of any explicit determination by the government that such parole was contemplated and any consideration of whether the "urgent humanitarian reasons or significant public benefit" required for such discretionary relief existed. Indeed, Balde does not contend that such reasons existed in his case.

Balde also does not contend that any individual under an order of removal who is properly released under supervision pursuant to § 1231(a)(6) is lawfully present in the United States for purposes of 18 U.S.C. § 922(g)(5)(A), and any such contention would be unpersuasive in any event. A noncitizen who has been determined to be inadmissible and ordered removed is not lawfully in the United States, whether he remains in detention or has been granted conditional liberty under supervision while awaiting execution of the order of removal. Release on supervision makes it lawful for such a person to be outside of jail; it does not change his or her immigration status. *Cf. United States v. Bravo-Muzquiz*, 412 F.3d

21

1052, 1055 (9th Cir. 2005) (noncitizen's release from custody on an immigration bond does not change his otherwise unlawful status). An alien under an order of removal who has not been paroled, and who is permitted supervised release in error when he had not yet become eligible for such release by virtue of expiration of his removal period (such as Balde), can have no greater lawful status than one who was properly released under § 1231(a)(6).

In any event, whatever may have been the case at the moment of Balde's release from detention and admission to the ISAP program, the key inquiry for purposes of § 922(g)(5)(A) is whether a noncitizen "lacks lawful immigration status on the date charged in his indictment." *United States v. Lucio*, 428 F.3d 519, 525 (5th Cir. 2005); *see also United States v. Latu*, 479 F.3d 1153, 1157 (9th Cir. 2007) (noting that defendant was "found to be in possession of a handgun on May 15, 2004," and therefore "[t]o sustain a conviction under § 922(g)(5)(A), the government must prove that, *on that date*, Latu was 'illegally or unlawfully in the United States'" (emphasis added)). There is no dispute that, by the time of the conduct for which he was indicted, Balde had a final order of removal lodged against him, even if the government was unable to remove him at that point, and had exceeded the 90-day removal period. Therefore, by that time, his continued

22

supervised release from detention was firmly within the authority provided by 8 U.S.C. § 1231(a)(6) and would not constitute parole.

Having determined that Balde was not paroled, we have little trouble concluding that he is within the category of individuals prohibited by § 922(g)(5)(A) from possessing a firearm. In enacting the statutory scheme, Congress decided that, except for very limited categories of persons, noncitizens who are not lawful permanent residents should be prohibited from possessing a firearm in or affecting commerce. *See generally* 18 U.S.C. § 922(g)(5). Its choice of language, which prohibits firearm possession both by most holders of non-immigrant visas and by all those unlawfully present, covers large numbers even of those who have temporary authorization to enter the country, *id.* at § 922(g)(5)(B), as well as those who have no such authorization, *id. at* § 922(g)(5)(A). The facts of Balde's case make clear that he is in the latter category: he has been finally adjudicated to be unlawfully present. Permission to reside at liberty under supervised conditions rather than in immigration detention does not equate to a conferral of lawful status in the country, and therefore does not confer permission to possess firearms. Our sister circuits have upheld convictions under § 922(g)(5)(A) of individuals who had an application

for relief pending or who were in removal proceedings that were still in process and had not yet resulted in entry of a final removal order. *See, e.g.*, *Latu*, 479 F.3d at 1158–59 (affirming conviction of defendant who had pending application for adjustment of status); *United States v. Atandi*, 376 F.3d 1186, 1190 (10th Cir. 2004) (finding defendant was illegally or unlawfully present when he failed to satisfy conditions of student visa, concluding "[t]he fact that he had not yet been ordered removed is not relevant to the question of whether or not his presence in the United States was then authorized"). We see no principled reason why such individuals should be considered to be unlawfully present, even before entry of a final removal order, while Balde, whose removability had been fully litigated before the agency and this Court resulting in a final determination that he had no legal right to be in the United States, should not be.

Accordingly, in light of Balde's immigration status at the time of the conduct underlying his arrest, we conclude that he was properly prosecuted under Section 922(g)(5)(A).

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.